SCHMOLT, by guardian *ad litem,* Respondent, vs. H. W.
,WRIGHT LUMBER COMPANY, Appellant.

*February 24—March 14, 1911.*

*Master and servant: Injury to minor servant: Knowledge of danger:
Warning: Duty of master: Vice-principal: Negligence: Contribu-
tory negligence: Questions for jury: Special verdict: Instruc-
tions to jury: Burden of proof: "Accident:" Damages.*

1. Plaintiff, a young man seventeen years of age, inexperienced in
   logging, whose incapacity as a teamster had been called to the
   attention of the defendant's foreman, was injured while walk-
   ing, by order of the foreman and without warning of the dan-
   ger, beside the pole team and driving the middle one of three
   teams attached to a loaded log sled, which was being pulled
   down a rather steep descent in a narrow roadway between banks
   of snow, by reason of one runner of the sled coming in contact
   with an obstacle, thereby causing the tongue to swing violently
   to one side and throw the near pole horse against him, felling
   him to the ground, where the sled ran over him. *Held,* upon
   the evidence, that the danger was not so obvious nor plaintiff's
   experience so sufficient as to warrant the court in saying as mat-
   ter of law that he should have known such danger or that warn-
   ing was unnecessary; and that the questions of negligence and
   contributory negligence were therefore for the jury.
2. In such case the fact of plaintiff's knowledge or lack of knowl-
   edge of the danger, and the fact whether he ought to have
   known of the same, were relevant as bearing both upon the
   question of defendant's negligence in failing to give warning
   and upon plaintiff's assumption of the risk and contributory
   negligence; and so far as they went to establish the former the
   burden of proof was on the plaintiff, but so far as they consti-
   tuted essentials of the defenses named the burden was on the
   defendant.
3. The trial court having submitted these elements in an appropri-
   ate question, not directly or specifically, but as items of fact
   going to prove or disprove want of ordinary care on the part of
   defendant's foreman in failing to warn the plaintiff,—incorpo-
   rating them into the question by the charge to the jury and in-
   structing that the burden of proving such want of ordinary care
   was on the plaintiff,—it was not error to refuse to submit the

specific question whether a person of plaintiff's age and experience ought to have known that the tongue was liable to swing with enough force to throw the horse or neck-yoke against him.

4. Nor was it error in such case to submit separately the question of contributory negligence by the questions, "Did plaintiff know that in going down the hill the near pole horse was liable to be thrown to the side by the swinging of the tongue of the sleigh?" and "Ought the plaintiff, in the exercise of ordinary care, to have comprehended the danger of being thrown down by reason of the pole horse being thrown to the side by the swing of the tongue of the sleigh?" and to charge that, upon the issue so submitted separately from the question of defendant's negligence, the burden of proof.was upon the defendant.

5. Under the facts as stated the duty, if any, to give warning was a duty of the master, which he must exercise himself or through a vice-principal,—in this case the foreman,—and if plaintiff's injury resulted proximately from neglect of this duty, concurring negligence of the foreman as a fellow-servant in some other duty would not change the result.

6. Where in answer to proper questions the jury found negligence of defendant and that it was the proximate cause of plaintiff's injuries, refusal to submit the question whether such injuries were the result of "mere accident" was not error, though in some cases such a question would be proper.

7. For an injury resulting in loss of an arm and in great pain and suffering, an·award of $6,975, approved by the trial judge, is *held* not so excessive that it should be set aside by this court.

Appeal from a judgment of the circuit court for Lincoln county: James O'Neill, Judge. *Affirmed.*

*John Van Hecke* and *Edward M. Smart,* for the appellant.

For the respondent there was a brief by *F. J. & A. H. Smith,* attorneys, and *Olin & Butler,* of counsel, and oral argument by *F. J. Smith* and *J. M. Olin.*

Timlin, J.    Judgment went for the plaintiff on a special verdict as follows: (1) Did the plaintiff fall by reason of the near pole horse being thrown to the left by the swing of the tongue of the sleigh?    Answered, Yes.    (2) Did the defendant's foreman use ordinary care in not warning the plaintiff

that the pole horse was liable to be thrown to the side by the swing of the tongue of the sleigh in going down the hill? Answered, No. (3) If you answer the last question "No," then was such want of ordinary care by said foreman in not warning the plaintiff the proximate cause of plaintiff's injury? Answered, Yes. (4) Did want of ordinary care on the part of the plaintiff contribute to produce his injury? Answered, No. (5) Did the plaintiff know that in going down the hill the near pole horse was liable to be thrown to the side by the swing of the tongue of the sleigh? Answered, No. (6) Ought the plaintiff, in the exercise of ordinary care, to have comprehended the danger of being thrown down by reason of the near pole horse being thrown to the side by the swing of the tongue of the sleigh? Answered, No. (7) What sum will compensate the plaintiff for the injuries he received? Answered, $6,975.

At the close of the evidence the defendant requested the court to direct a verdict in its favor. The request was denied and due exception taken. After verdict the defendant moved to change the answers returned by the jury as above indicated to questions 1, 2, 3, 4, 5, and 6 of the special verdict because not supported by the evidence. In this way appellant brings up the question of the insufficiency of the evidence as a whole to support the verdict and the insufficiency as to each item of fact or group of facts represented by a question of the special verdict.

We cannot undertake in this opinion to review the evidence in detail. Summarized we think it tends to show and authorized the jury to believe that at the time of plaintiff's injury he was between seventeen and eighteen years of age and engaged in a lumber camp in driving a rather decrepit team, rolling logs on a sled by what is called cross-hauling and occasionally helping out the sled teams with their loads by hitching ahead where such aid was required. He had been engaged at this a little more than a week prior to the

time of his injury, which occurred on March 9, 1907. In
the latter part of January, 1907, he came to this lumber
camp and applied for work. This was his first attempt to
work at logging. He was offered work as a teamster, but
objected to this and informed the foreman of his inexperi-
ence. He was induced to attempt to drive team, but not at the
same work in the performance of which he was injured. He
began driving team and continued about a week. His ig-
norance and incapacity in that direction were so manifest
that his fellow workmen objected. They called the attention
of the foreman to it. The foreman took the reins out of
his hands on several occasions and the plaintiff asked to be
relieved and given other work. The foreman did relieve him
from driving team and placed him at other work, and he con-
tinued this work until about a week before his injury when
he was put on cross-hauling with a team. The plaintiff had
little or no experience in logging and was awkward and quite
incapable, to the knowledge of the foreman. On the occa-
sion in question one of the sled teams, with a logging sled
seven feet wide from runner to runner, carrying twelve-foot
bolsters or bunks, was brought up to be loaded at a skidway
on a side hill. The road from this skidway down to the
main logging road was made by a snow plow something more
than twelve feet in width in snow about two and one-half
feet deep, and consequently had banks of snow on the sides
and presented the appearance of a snow cut about twelve feet
in width between the banks, and from the skidway in ques-
tion it descended for the first 138 feet eleven feet to a short
level place or shelf in the descent, and from this to the base
of the hill, 452 feet, it descended twenty-seven and three-
fourths feet, and there were several side curves. The sled
team which handled the load of logs is called in the evidence
the pole team. This team alone had power to hold back the
sled in its descent. In order to enable this team to hold back
the sled on the steep descent mentioned, hay was placed in

the runner tracks nearly all the way down, including the shelf mentioned. The sled was loaded with about.4,000 feet of hemlock logs, and the pole team with the load started down hill on the hay placed in the runner tracks until it reached the shelf in the descent. Here, by reason of the hay, the sled stopped and the pole team was unable to move it down. The foreman was present and directing operations. He ordered the plaintiff with his cross-haul team to hitch on ahead of the pole team and start the loaded sled. The plaintiff did so, and both teams were unable to start it off this shelf. He then ordered a third team hitched on ahead and some men to remove the hay from under the runners, intending that when the loaded sled was moved downward off this shelf either that the pole team should stop the sled and the two forward teams would be detached and the pole team would take the load down the remaining descent, or that the three teams should continue the descent. The plaintiff demurred, but the foreman paid no attention. He was then ordered by the foreman to take a position on the left side. The driver of the pole team was sitting on the load, the plaintiff, driver of the next team, standing in this cut near the runner track between that and the horses and slightly behind his team and about opposite the neck-yoke of the pole team and directly in front of the descending sled, and the driver of the lead team was also standing in this cut and near the runner track and in front of the descending sled, but of course about a team's length further from the sled. It was a most foolhardy proceeding. Here was a snow road consisting of a cut wide enough for the bolsters of the sleigh, with banks on either side, a steep descent, nothing to hold back the load but the pole team and the hay in the runner tracks, and two teams and two drivers in the cut ahead of the descending sleigh should it continue to descend. A stumble and fall meant danger or death. The three teams apparently made several attempts to start the load, swung the runners a little

to one side, got them off the hay, and so started the loaded sled down hill, the two drivers and the two forward teams running ahead and the pole team evidently unable to hold it back as soon as the runners left the hay. In the first part of the descent a sled runner on one side struck or met some obstacle, the tongue or pole swung to that side, threw the pole horse against the plaintiff, knocked him down, and the descending sled passed over him, severing one arm from the body and otherwise injuring him. Hintz, Jr., an experienced lumberman who seems to have kept his wits about him better than any of the others, tells how it happened. He says after the sled started they went down the hill faster than a run, and it was impossible to unhitch the forward teams. The foreman testified that the sled tongue did so swing over, and also that that was an inference or opinion of his, and again that he had said on a former examination that he saw it happen, and again that this was an opinion of his. The plaintiff testified that the tongue swung the horse over against him and that it was his opinion that the tongue swung. We cannot stick on mere words or weigh the verdict of a jury against mere literalisms, and it is manifest that the witnesses meant by "opinion" an inference derived from what they saw. Probably neither of them saw the pole or tongue at the critical moment, but plaintiff saw the motion of the horse and the foreman saw this and saw the movements of the sled, and it was not impossible to tell whether the horse left the track in the usual manner by being driven to one side by motion of the reins or moved by his own volition, which would be more or less of a slanting or gradual movement, or whether he jerked suddenly at about right angles to his course. We think there was evidence to support the finding that the pole swung and that the pole horse struck the plaintiff by reason of this after the load started.

It is probably common knowledge and within the experience of every young man who has driven horses that the pole

or tongue will whip or swing from side to side if the wheel or runner on one side of the vehicle meets an obstacle while the wheel or runner of the other side is free.   But we cannot say it is within common experience that this will happen with such force and violence as to suddenly lift a team of horses and throw them to one side of the traveled track.   This appears to be what happened in the instant case, due perhaps to the size of the load, the declivity of the hill, and the rapid descent.   The plaintiff was ordered by the foreman into a very dangerous position.   The foreman had knowledge at the time of the inexperience and incapacity of the plaintiff. The danger from swing of the sled tongue was not so obvious nor the experience of the plaintiff so sufficient as to permit us to say as matter of law that the plaintiff ought to have known of it, and it was a fair question for the jury whether or not, in the exercise of ordinary care at the time of putting the plaintiff into this position, the foreman should not have warned him of the danger of walking or running alongside the neck or shoulder of the pole horse in case the pole team was unable to hold back the descending sled and the three teams should be obliged to make the full descent of the hill. We think there was evidence from which the jury might infer that the plaintiff did not know, and was not necessarily bound in the exercise of ordinary care to know, that this swinging over of the pole horse was likely to happen, and that the defendant, through its experienced and presumably competent foreman, ought to have known not only of this danger but of the lack of knowledge and experience on the part of the plaintiff, entitling the latter to warning or instruction.

It is argued that the court erred in refusing to submit in the special verdict aforesaid a question requested by the defendant, which called for a separate finding of the jury, as to whether a person of plaintiff's age and experience ought to have known that the tongue was liable to swing with enough

force to throw the horse or neck-yoke against him, and also in instructing the jury that the burden of proof with reference to questions numbered 5 and 6 was upon the defendant. These objections may be considered together. From the form of the verdict given it is apparent that the court attempted to cover the question of defendant's liability by the first three questions and the contributory negligence of the plaintiff by the next three questions. No doubt other forms of expression might have been used, for the possibilities in this direction are almost infinite. The second question presented to the jury in very comprehensive form an important constituent of the liability of the defendant. It is uncontroverted that no warning was given to the plaintiff. The court instructed the jury with reference to this question:

"Where the dangers of an employment are visible, so that a person of ordinary intelligence, in the exercise of ordinary care, cannot fail to see and comprehend them, his employer is under no legal obligation to warn the servant of such danger. But if there exist facts known to the master and unknown to the servant increasing the risk of employment, or if the servant from youth, inexperience, ignorance, or want of general capacity may fail to appreciate the dangers, the master is bound to disclose such facts or give such instructions and cautions to the servant as will enable him to comprehend the risks and to do his work safely with proper care on his part. . . . But it is claimed the danger arising from the liability of the tongue to swing and throw the near horse over and against the plaintiff was not open or obvious, and comprehended by the plaintiff, or that in the exercise of ordinary care, considering his age and experience, he would not be expected to have comprehended it, and that in such case there should have been warning of such danger. This is a question which is for decision by the jury. It was the duty of the foreman to give to the plaintiff warning of such of the dangers not open and obvious to be apprehended from driving a tow team in the place in question as a boy of ordinary intelligence and prudence of the plaintiff's age and experience, so far as these matters were known and apparent

to the foreman, would not be likely, in the exercise of ordinary care by the plaintiff, to comprehend and foresee. If the foreman failed in performing this duty under these circumstances it was a want of ordinary care, and in such case the jury should answer the second question 'No.' "

The court also instructed the jury that if a boy of ordinary prudence and intelligence, of plaintiff's age and experience, exercising such care as such boys ordinarily exercise under similar circumstances, would have known or comprehended this danger or that the swing of the tongue would be liable to throw the pole team to the side, then there was no duty on the part of the foreman to warn him of this danger. The jury was instructed to consider all the facts and circumstances and say whether the foreman failed in any duty to warn and instruct the plaintiff, and that the burden of proof was on the plaintiff to prove by a preponderance of evidence that the foreman failed to use ordinary care in this respect. These instructions brought within the scope of the second question all that was attempted to be covered by the question proposed by defendant, and also cast the burden of proof upon the plaintiff to show that he did not know of the danger and ought not in the exercise of ordinary care to have known thereof. *Rahles v. J. Thompson & Sons Mfg. Co.* 137 Wis. 506, 118 N. W. 350, 119 N. W. 289. In this case the fact of plaintiff's knowledge or lack of knowledge of the danger in question, and the fact whether he ought to have known of the same, were relevant as bearing upon the duty to warn and consequently upon the liability of the defendant. These facts bore also upon the care which the plaintiff should exercise to avoid injury and upon his assumption of the risk, and consequently were relevant also to the issue of contributory negligence. So far as they went to show the defendant negligent the burden of proof was on the plaintiff to establish these facts and this negligence. So far as they constituted essentials of the defense of assumption of risk or contributory

negligence the burden of proof was on the defendant. The court below met this properly by including these elements in the second question of the special verdict, not expressly or specifically, but as items of fact going to prove or disprove negligence in failing to give warning, and properly instructed the jury that the burden of proof to establish all facts necessary to show defendant negligent was upon the plaintiff. There was no error in this. As he might do by special verdict, he then submitted three questions, each bearing upon the assumption of risk and contributory negligence if any on the part of the plaintiff. On this issue so separated by the special verdict from the question of defendant's negligence he properly charged that the burden of proof was upon the defendant. *Hulehan v. G. B., W. & St. P. R. Co.* 68 Wis. 520, 32 N. W. 529. Had the items of fact consisting of plaintiff's knowledge and his duty under the circumstances to know of the danger been submitted by separate question in that part of the special verdict relating to the defendant's negligence, the instructions would have been as given relative to the second question, viz.: that the burden of proof was on the plaintiff. But in that case it would not have been necessary to submit by repeating these same interrogatories again in that part of the verdict relating to assumption of risk and contributory negligence. They would be established by being found once. In the instant case the trial court grouped these facts in his instructions as constituents of the negligence or lack of negligence of defendant. When he came to submit the subject of contributory negligence in the exercise of a proper discretion he specialized further; he divided the subject of contributory negligence more into constituent parts, and having done so he might give the jury the rule relevant to the burden of proof relating to these constituents. He could not foresee what the answers of the jury would be, and in practice he might frame a special verdict so as to present the negligence of the defendant as one issue and the contributory negligence of

the plaintiff as a separate issue to the jury, each with its appropriate burden of proof, notwithstanding some fact bore such relation to each that it was a constituent of each issue.

There was no relation of fellow-servant between the foreman and the plaintiff in the matter of warning or instructing the plaintiff. That was a duty of the master which he must exercise himself or through a vice-principal. If the injury resulted from neglect of this duty as a proximate cause of such neglect, concurring negligence of the foreman as a fellow-servant in some other duty would not change the result. So we think there was no fellow-servant question to be submitted to the jury. *Grant v. Keystone L. Co.* 119 Wis. 229, 96 N. W. 535.

The appellant requested the court to submit to the jury thirty-eight questions, some of which are covered by the verdict submitted, some are mere items of evidence, and all of which carry the itemization or specialization of items of fact beyond the limit possible in the practical administration of justice. *Mauch v. Hartford,* 112 Wis. 40, 87 N. W. 816. One of these requested questions was: "Were the plaintiff's injuries the result of mere accident?" The cases of *Kucera v. Merrill L. Co.* 91 Wis. 637, 65 N. W. 374, and *Hennesey v. C. & N. W. R. Co.* 99 Wis. 109, 74 N. W. 554, are cited for the purpose of showing that it was error to refuse to submit this question. Unless the words "mere accident" are held to be descriptive of an act or omission producing injury not proximately caused by the negligence of the defendant, it must be obvious that a finding like this would constitute no defense and would be irrelevant. The event thus described must negative either defendant's negligence or proximate cause in order to be relevant as a defense. If it does present such negative it is covered by the findings of defendant's negligence and proximate cause. Cases can arise in which the evidence takes such a turn that it is proper to submit this question, but they are rare.

In the first case above cited there was no finding by the jury that the defendant was negligent and the plaintiff was unable to state how the injury was incurred. Under these circumstances it is said that such a question was proper. In the *Hennesey Case* the person injured was found near the railroad tracks dying from bodily injuries. He died in a few minutes without speaking. No one saw how the injury occurred; that question resting entirely on circumstantial evidence. While in *Zarnik v. C. Reiss C. Co.* 133 Wis. 290, 113 N. W. 752, it was ruled that the circuit court was justified in refusing to submit such a question where there were proofs tending to show negligence, witnesses to the transaction, and a finding of negligence by the jury. See, also, *Mauch v. Hartford, supra,* where the court said:

"Question No. 17 asked the jury whether the injury was the result of mere accident. That only tended to confuse the jury. It had no necessary or proper place in the verdict, under the circumstances, since the facts in issue constituting the alleged negligence and its proximate connection with the injury, rendering it actionable, were covered by proper questions."

The damages awarded to the plaintiff are large, but they have the sanction of the jury and of the learned trial judge. The permanent loss is certain, the pain and suffering must necessarily have been great, and we do not feel warranted under these circumstances in interfering with the amount approved by the jury and the trial judge.

Other questions presented have been considered, but do not appear to us to require special notice.

*By the Court.*—Judgment affirmed.